You may proceed. Good morning, Your Honors. My name is Christopher Okeh. May it please the Court. I'm counsel for Plaintiff Appellant Angela Calloway. This is an appeal de novo of the trial court's award of summary judgment on all claims to the defendants in this case. The defendants in this case are corrections officers at the time of the events in question who are all stationed at the court. The second visit to ACC, the Correctional Center, took place on Sunday, July 17, 2016. Ms. Calloway arrived at the facility around 12.15, accompanied by the eight-year-old son of the offender she was scheduled to visit with, as well as the boy's grandmother. Before her visit that day was concluded approximately 90 minutes later. So this is a section 1983 type thing? It is. 42 U.S.C. section 1983. In that instance, the court has the Pearson. You can either look to see if it's a constitutional violation or determine if it's clearly established. Either one could be done first or second. In this instance, the trial court went to the constitutional violation and determined there was no constitutional violation. That's correct, Your Honor. Because the trial court's determination, it was the trial court's perception that there was a reasonable suspicion. In other words, there were articulable facts that would support a reasonable suspicion. How was the trial court wrong in determining that there was no constitutional violation here? Well, Your Honor, I disagree strongly with the trial court's determination in that regard. I think the first thing to look at is the way that the trial court viewed the standard of reasonable suspicion, the Fourth Amendment standard for a violation. In this case, at oral argument on the summary judgment motion in particular, the judge was concerned about what the videotape showed. Miss Callaway, of course, attended visitation for about 90 minutes. That entire period of time, there was video surveillance with two camera views, a view of Miss Callaway's front and a view of Miss Callaway's rear. The judge determined that that videotape generally corroborated... Let's make sure we set the stage for what we're talking about here. Yes, Your Honor. Understand, at least from my perspective, you've got two officers who actually did the search. Yes, Your Honor. In that context, at least from the defendant's perspective, there was a lot that was in determining whether there was a reasonable suspicion. Is that limited or is that too broad in the way the trial court did it? Or should we just look to see what those who actually did the searches, but those who committed the violation did? Well, there was some separation among the defendants. One particular officer, Investigator Loki, was the deciding official who decided, yes, Miss Callaway must be searched under these circumstances. It's appropriate to submit to a strip search. The trial court looked at the reasonable suspicion standard, I think rather superficially, Your Honor. The actual standard, as it's been set forth by this court and other courts around the circuits around the country, is that a warrantless strip search of a prison visitor in a institutional setting is only appropriate if there is reasonable suspicion that the visitor in question is possessing or intending to introduce contraband into the facility. And the trial judge's analysis of the reasonable suspicion standard, I think, never went beyond a superficial, well, was the officer who was monitoring the video surveillance in this case and relayed his observations to the deciding official, Mr. Loki, was it enough that he had some generalized suspicion about Miss Callaway based on what he saw? Well, the two officers you're talking about, Officer Jeffrey Brown and Officer Loki. Yes, they were the deciders. Looking at their conduct, and I'm trying to, I was trying to figure it out in terms of what the trial court did. If you had a police brutality case, you would look at what the officers are doing there at the scene. You wouldn't go back to the police station and find out all the things that transpired there unless there was communication directly with them. But in this instance, the evidence that the trial court, from your perspective, as I understand, should have considered for reasonable suspicion would be that which Loki and Brown knew at the time that they undertook this this action. Well, I think what's undisputed is that Loki and Brown did not observe Callaway's conduct, did not know anything about Callaway before that day, had received no specific intelligence regarding Callaway. They had specific intelligence regarding the offender in the prison that she was visiting. The guy she was visiting was suspected of getting something smuggled into him. I think that the transferred from a less secure institution to this one. That's correct, Your Honor. Something related to that. Well, I think it was unrelated. I think the offense that he had been subjected to at the prior facility involved kind of a ham-handed scheme that he worked with his girlfriend outside and his mother-in-law or something like that, where they were going to throw tobacco, one-pound tubs of tobacco over the fence of the facility, and an inmate was going to have nothing to do with visitation, had nothing to do with Ms. Callaway. We wanted to get contraband into the prison facility, that's what they suspected. I think that there was no evidence of a scheme in place at the time that Ms. Callaway visited. Well, the only thing they had was an anonymous tip. Mr. Loki indicated he could not remember who gave him the tip. All he could remember is that someone told him in passing in the yard, Travis is moving. It's two days before. Appreciate that tip from the one which the court discussed in Leavitt, which was a case in which there was also a tip. Well, in this particular case, the tip had no indicia of reliability. It didn't apply to Ms. Callaway. Travis is moving. It didn't include his last name. That's code for sneaking contraband into the prison. Well, no, that's not necessarily, and Mr. Loki actually gave testimony on that. He said it could mean somebody was moving something within the prison. It could mean somebody was trying to move something into the prison from outside. We had some articles and a good deal of publicity in the area between 2014 and 2017 that a lot of contraband was coming into the prison and a lot of misconduct was being undertaken by guards at the prison, not that information is not particularized to Callaway. That's exactly right, Your Honor. And what I was trying to get out of you from Leavitt is that this is a case in which there is a tip, even if it's moving, has nothing to do with Callaway. That's exactly right, Your Honor. The tip is anonymous. Exactly. The tip, there's nothing to show about the reliability of it. I mean, that's what I'm trying to pull out of you. Exactly. I think that's correct, Your Honor. Well, and we had testimony from the deposition that said, you know what, the investigators, the COs, we get a lot of garbage tips. You have to check into them. You've got to do some investigation before you can just act on them. And in this case, Mr. Loki just acted on his hunch. In contrast with Leavitt, that's what I'm saying. Yeah. Leavitt was a very specific tip that a particular CO or prison employee was going to bring in marijuana in her tampon. That was the tip in Leavitt. And, you know, understandably, I'm not arguing that Leavitt wasn't correctly decided. I'm not arguing that Leavitt's not the correct standard. In fact, Leavitt recites the same reasonable suspicions. It was correctly decided. I'm not arguing that at all. I'm arguing under the standard set forth in Leavitt, which is the reasonable suspicion that a particular visitor is attempting to introduce contraband into the prison. That standard is actually incorporated into Virginia Department of Operating Procedures for deciding when a strip search is appropriate. There has to be some indication that a person is trying to bring in contraband. And there was no link between Ms. Calloway and any contraband. Jeremy Nelson, the man who monitored video for 87 minutes while Ms. Calloway had a pleasant conversation and visited with her longtime friend, Mr. Talbert, someone who she was never involved with other than as a friend since she was 18 years old or so. So you got these articulable facts the trial judge decided. And you probably can get there with saying Travis history and a tip. They are not particularized to Calloway. That's correct. There was evidence that some said that her demeanor was such as she was nervous. Well, she was furtive in her actions and she adjusted her clothing. What about those? Well, Your Honor, I think that that's where the trial judge invaded the province of the fact-finder and usurped that role for herself. I think that the video speaks for itself. I elicited a admission from Mr. Nelson, who was monitoring the video, that at no time did he detect presence of contraband or suggestion that there was contraband on Ms. Calloway. And I think what he communicated to Mr. Loki was, well, she seems to be making some suspicious movements. That is not a report of criminal misconduct. That's not a report of violation of the visitation rules. In fact, on the videotape, which I think again speaks for itself and I commend the court to review that thoroughly, at least look through it once, in the same frame as Ms. Calloway that Mr. Nelson is surveilling the entire time, in the same frame there's another visitor who very clearly has her hands up her shirt, hidden from view from the cameras, hidden from view from the corrections officers that were circulating around the room. If Ms. Calloway had been acting in any way that was inappropriate, that somebody in the room would have noticed, the first indication that we had was from the officers that we interviewed and from Assistant Warden Miller is that typically if a visitor is behaving in visitation in a way that's going to get them ejected or cornered for search or whatever, that the officers on duty will let them know, hey, you can't do that. You can't do that. It was. And Loki and Brown relied on Nelson. Entirely. And Nelson made, gave his opinion that they look suspicious in her movements there. Yes. And Loki said he had done this a couple of times before and both times it proved correct. Well. And so now Loki is relying on Nelson's view coupled with the tip which he said he began hearing a few days before. Yes, Your Honor. That he was on the move and the prior knowledge that he had made an attempt to introduce tobacco into the prison. And so Loki tells Nelson, keep a watch over any visitor who comes. Yes, Your Honor. Nelson looks and in his judgment, and it doesn't look like he knew any of this other background information, maybe he did, but in his judgment, his judgment, he involved in something. She reported that to Loki. Now Loki puts all that information together and gives a couple of other officers instruction to search her. And it seems to me the focus ought to be, did Loki have a reasonable suspicion based on the evidence that was collected? Yes, Your Honor. I'm not sure we can isolate each fact and say, did this show there was drugs? Did this show, it was a collection of information that created a suspicion, at least that according to Loki and Brown. Yes, Your Honor. Well, I think that's generally correct. But I think that what the way you've recited those facts. What's generally correct? I think it's generally correct, the sequence of events that Loki relied on what Nelson told him and Loki also had these other facts that he thought he knew in his mind. But Nelson only told him that she was messing around with her abdomen and pants here. That's correct. He didn't give any details of anything else and he didn't know anything else. I agree. And every bit of the other evidence that came on this tip was not particularized to Calloway. I agree, Your Honor. So when you come down to it, all he knows is some guy named Loki says this and Loki didn't tell him, he also said Loki didn't tell him she was nervous. That's well, no, no, Heidi Brown said in deposition and in her affidavit that she gave in support of summary judgment that when Ms. Calloway first arrived at front entry to the prison before she was, she searched her and let her proceed on that she appeared nervous. It appears that she only communicated that information to Nelson down in master control. Nelson You got an inmate or you got some anonymous tip out of the blue that says he's moving, he may have done something in the past. Someone comes to visit. She's been through a criminal check. She's only been there twice. And you get a, you get a state that says, well, she's messing around with her clothing with no details, right? A person can be stripped search for that apparently to the point she's got to take down her pants. She's got to have a, uh, uh, uh, anal areas examined all of her cavities. They got to look up into them for that, right? It seems, it seems, Your Honor, that this is probably the weakest case that the who was remotely monitoring by video. He is an uncorroborated hearsay declarant to, to Benjamin Loki. Apologize for this after they did it. They must have known you, this, that was just nothing here. Well, Benjamin Loki did not apologize and neither did Jeffrey Brown, but other officers who are aware of what had happened, profusely apologized to my client and said, this should never have happened. Sometimes people think they see something and they don't really see something. He also consented, didn't he? Well, that's the question. I think the trial judge, I think the trial judge, yes, she did sign a consent form, Your Honor, but I think that her, her test trial judge didn't reach that issue as to whether it was freely involuntarily. I think she assumed for purposes of deciding the reasonable suspicion issue that she didn't have to reach that. Did you abandon your fifth amendment claim and your claim as to hostage? Cause you do not argue those cases. I did not argue the fifth amendment on my brief. That's gone, right? Yes, Your Honor. How about Hoskey? Hoskey, yes. We've let Hoskey go. We don't believe he had any involvement in the decision to search Ms. Calloway. We believe that the decision to search Ms. Calloway was inappropriate on the full facts that were known to them at the time. Loki and Brown had no independent knowledge of anything regarding Calloway. Thank you, Mr. Okay. Ms. Calloway. Thank you, Your Honor. Okay. Good morning, Your Honors. And may it please the court, Michelle Callan for the defendant appellees. I think it's important in this case to keep in mind the task that prison officials have on a daily basis. They're faced with the difficult task of balancing the interests and the rights of prisoners and their visitors against important security concerns. What's important in this case is to analyze it in terms of what was done was a constitutional question as to whether there was a violation. And so the issue we must address here is whether there was particularized information and that as to Ms. Calloway that would indicate a reasonable suspicion. So when we go there, there are five things essentially the trial court, uh, that's what's important. If we talk about the general idea of what prison officials do, I totally agree with you, absolutely have a tough job, but we got a case in which a lady comes in, she's been through a total search. She'd been to a total criminal investigation. She's been there before. There's nothing that indicates this woman has anything on her. She goes into this, this, this, this facility and based upon, uh, the messing around with her clothes, you then essentially based upon, uh, uh, with a tip that has no indicia of being credible because you don't know who gave the tip. You don't know anything about her alliance. You don't know anything about the tip other than he's moving. Then you search her to a strip search. You make her take everything off, put her in a room and just do the most invasive search. She, she has her, in her words, her period is on. She's got to take a tampon off. And, and place that in an app. They've got examined that this is just the woman who came there. And of course it doesn't matter. I mean, ultimately in terms of the legal, they found nothing, but there was nothing. And that's the analysis we must confront in this case here. I got to agree with counsel. I mean, a lot of cases, but this is, this is an interesting one from my perspective, because of just the, the nature of how it was done and, and there are cases where this Levet is on point in terms of the tip, but this is not Levet at all. So, so in some ways this case is similar to Leverett and others it isn't. I think you're right. I was similar on that tip. Leverett, you had a tip from someone who told you this person is going to do this. And it was a, it was one, it was a substantiated tip. You knew what was coming from the whole bit here. You have no clue who this tip is from. It's anonymous is maybe some double, triple hearsay. It has come along the line. He's involved. Travis is, is, is definitely a bad person that the guy in the prison is definitely bad. I mean, you don't have to go very far to go there, but to make it particularized, Ms. Callaway is a different story. And that's where I think we need to go. So I think looking at the totality of the circumstances, your honor, which is the test under the fourth amendment, the reasonable suspicion standard it's important not to take a divide and conquer approach, which is specifically what the is not a divide and conquer. This is a totality of the circumstance case. And it is a case in which the trial judge has made a determination from the beginning. Is it, is it not? How do you, how do you view the evidence here? Do you view the evidence in a light most favorable to Ms. Callaway? That's correct at summary judgment, but at the same time, under the fourth amendment standard, the question is not specific. The question is not what actually happened. And the question is whether specific objective facts on the record, um, in which a prudent official in the light of that, that official's experience. That's where the, that's where the conundrum comes. You've got about five little things I see here. The trial judge tell me about, and it's not parsing them out. It's just looking at the specific facts here because you can't look at a lot of little stuff and make a big case out of it. You got to have something there. That's correct. So what are those facts that you maintained that gave these officer a reasonable suspicion that there was some particularized reason as to do this? Five, five facts on, um, five, five on this record, Your Honor. The first one is the corroborated tip. So, so it is a tip. Um, and that tip was later on corroborated by additional evidence. Anonymous tip. Yes, Your Honor. That for which you have no evidence as to whether it was ever been reliable before. Right. And, and Ms. Calloway was not searched purely because of a tip. She was not searched. Well, we're just dealing with that fact. You brought that fact up. I'm going to go down these five. I'm working with that one. I'm just seeing so far, I'm just not there because you got a tip. It's a tip. It's a generalized tip that doesn't tell you very much. Exactly. And she wasn't searched the moment she arrived at the prison. It was only when these five circumstances came together that she was ultimately searched. Well, Loki hadn't, he, he couldn't identify the person. He's the guy. He couldn't identify who gave the tip. He didn't tell you about the method of material that was going to be taken. None of that is there from the tip. So what's, what's number two on the list? So that's correct. One, once the tip, the tip is then corroborated by additional evidence. Um, the tip is corroborated by Talbert's history of previously attempting to smuggle in drugs. Does Loki know that? Yes. Loki, Loki knew of Talbert's history attempting to smuggle in contraband. So the tip is corroborated. Anonymous tip is corroborated by saying he has a history of doing what this tip says. That is one piece of evidence that, that helps, that makes this tip different than other cases, um, where tips are just entirely uncorroborated. For example, the doctor says he's going to move drugs and he's done it before. Therefore it's corroborating. It's a piece of corroborating evidence, Your Honor. Correct. And so in addition to that, there's other evidence in the record as well, further corroborating it. What's that? So in addition to that, um, it was both, um, Ms. Callaway and Mr. Talbert's behavior during the, during their interaction during the visit. Um, so, so in terms of Ms. Callaway's behavior, a trained officer, officer Nelson. That's important because the standard requires particular, particular,  That's correct, Your Honor. You say, what, what, with regard to her? So with regard to her, there, there are a couple of pieces. First, her arrival, um, she appeared to an officer looking particularly nervous. It wasn't communicated to, to, to, to, uh, Loki. It was communicated to officer Nelson, who was the officer. He didn't communicate that. I reckon it shows it right there. JA 429. He said he never told him prior to the search that Callaway had been acting nervously. That's correct, Your Honor. What's the next one? Well, but it plays into officer Nelson's review of the tape as he's doing it. Well, uh, well, Ms. Yes, he was conveyed to officer Nelson. Officer Nelson at 429 says Loki stated to him that no one, Loki's, uh, well, Nelson's, Nelson's behavior. He's like the guy down at the police station. We're talking about the people who actually did the search. So Loki says, he never, he said, Loki stated him. No one ever told him prior to the search that Callaway had been acting nervous. That's correct, Your Honor. But it played into officer Nelson's evaluation of Ms. Callaway's behavior during the meeting. So both, so officer Nelson, as he first saw Ms. Callaway walk into the visitor center. Let's see. And that may be a divided point. We're looking at the behavior of officer Loki and officer Brown. They're the ones that did it. When you go outside of this, this is the information that's coming to them. So you got to look at what did they know is the people. If you're in a police brutality instance, you're looking at a piece of people who did the actual acts. You don't go back to the police station and says, well, someone told me back then, or you told me this, you're looking at their acts as to whether they are particularized and individualized suspicion as to Ms. Callaway. So, so Nelson is not a player here, except to the extent of what what Loki knows. That's correct. Well, his, I mean, he's a defendant named in this case, but also his analysis of the entire situation. His, his, his defense, that's a whole different issue. That's how do you get to those when you start going to who else is in the case. But in terms of this constitutional violation, we focus on Loki and Brown. So as to Loki and Brown, Loki and Brown, um, officer Loki. We were on your, on your facts. You were on that. That was nervousness. Now what's the next one? So officer Loki had asked officer Nelson to evaluate Ms. Callaway and, and, um, or evaluate any visitor who came to visit, um, Talbert. And that happened to be Ms. Callaway, which was two days after he received that tip. And that's why officer Loki had asked officer Nelson to take a closer look, um, at anyone visiting Talbert. Um, and so officer Loki. We, we got that. We asked that. What I'm trying to understand is what is it that Loki has that gives him this particularized individualized suspicion against Mrs. Callaway? So it was officer Nelson's report of the suspicious activity that officer Nelson. It's right there in the record says messing around near her abdomen pants area. That's it. No details. So he testified that she, she was a couple of things that she did, your honor, uh, digging around. Officer Nelson. Um, so digging. I want you to tell me what he testified to, but what I want you to tell me is what Loki knew because he's the one that did the search. So Loki knew that officer Nelson, um, an officer with a, with a reliable history of identifying efforts to smuggle contraband. His credibility at all. Well, that's what, right. And so, so once he reports that he to officer Loki, that he's seen, um, activity that's suspicious and that raises suspicion, particularly the hands by the waistband and the movement of the pants and actions consistent with putting one's hands in one's pants. That's what officer Nelson. No evidence he put a pencil. Let me make it, make it understood. At least in the way I see this, you got an office, your point is, you got this officer is very reliable. He knows stuff, but Loki, but, but Nelson's opinion as to whether she is a reasonable suspicion is not going to get you there. We know that the opinion he can be, that's, that's not how you get there. You got to look at what he's saying. He says, she's messing around a pants area. That's it. Based upon that, then you go to a total, tip this off the board. You then conduct a search. So I think, I think it's important. I think that plus the, the Talbert's history of attempting to smuggle drugs, which is something that Loki knew as well, uh, yield a totality of the circumstances that justify a search. And I think it's important to keep in mind also the sorts of contraband that's brought in and the manner in which they're brought in in prison. I mean, Talbert himself was later caught attempting through visitor to smuggle in 95 strips of Suboxone and Suboxone strips are small little strips about the size of, uh, of breath of little breath strips. Um, and so those sorts of items are found, uh, attempting to brought into prison as they were, they were on this record, um, and in, in places, including places in place of a tampon. Um, and so those are the sorts of security concerns that are an issue. I'm in agreement with you in terms of that evidence and, or that, those facts that it's really bad. You know, things do get smuggled, smuggled in. Talbert here, I guess it was smuggling cigarettes or something like that, that he had been, was it, had you been smuggling drugs and all that stuff you're talking about right now? Previously? Yeah. So, so at his prior correctional facility, he attempted to smuggle in with the help of his mother, tobacco. Um, drugs, drugs in his stuff you're talking about. So the, so the record after, after Ms. Calloway's visit, yes, there was an attempt to smuggle in. That wouldn't work very well to talk about after her visit, but, but, but what the history that you're talking about, had he, was there any evidence he had done this? There was evidence that he attempted to smuggle in tobacco, Your Honor. Um, and so that. You got a tip he's moving. So probably if you're going to go on a history of tobacco, you think that Ms. Calloway is bringing in some tobacco. No, so it's, it's the contraband and the concern that contraband. I don't have any history of him asking for contraband. You're very strong on that point. You're very strong on the point that his history, he's done this before, coupled with this tip, he's moving and moving. Doesn't mean anything except smuggling something in at best. Where, I mean, so I guess if you want to look at it and we are looking in a light, most favorable Ms. Calloway, then you suspect she at best she's bringing in some cigarettes. I think that's one thing to be concerned about bringing in, but contraband and the idea of moving. Not a concern. You have a concern about everything. I'm talking about what this would a reasonable suspicion. Cigarettes are contraband, aren't they? Cigarettes are contraband, Your Honor. So your suspicion is she's bringing in cigarettes. No, Your Honor. I mean the term moving in prison. But the evidence here in a light most favorable to her would point to she's bringing in cigarettes. I don't think so, Your Honor, because there's no evidence in this record suggesting that she, suggesting anything related to cigarettes. This record reflects that. Nor anything else. So the record reflects a tip that Talbert was moving and moving as a reference to moving drugs. And so tobacco not being drugs. What expert testified to that? My understanding is that, that, that officer Loki, um. Moving couldn't be bringing in cigarettes. I'm not, I'm not familiar personally with the, with the, uh. Me neither. But my, my understanding from this record is that the term moving in prison. You know, his history is moving cigarettes and cigarettes and then he is moving. The tip is moving. You got to believe this is a guy who's moving cigarettes. I think looking at the totality of the circumstances. He could be doing drugs, but there's no evidence he's ever done drugs before. There's no evidence he even does. He's doing drugs, period. I think the question is what a reasonable officer would view and would, would consider in these circumstances. And when there's a tip that somebody's moving, um, and, and there's a desire to, it's reasonable for an officer to take a closer look when somebody two days later comes to visit the particular person where there has been this tip related to, to, um, a concern about that person smuggling and moving. I was going to get you to give me the answer that he's in, in trial for drug trials, drug crime, Your Honor. The record does not reflect why he's in, why he is in prison, Your Honor. Well, I think it is, but go ahead. I think it's also important. So there are, you know, five, the five pieces of evidence we lay out, um, in the record and that in our brief, and that the district court addresses as well, that corroborate that support the totality of the circumstances. Um, but I think taking a step back, it's also important as, as Your Honor, Judge Wynn noted, um, when my friend on the other side was speaking, there's also the qualified immunity piece of this case. So to the extent this court, uh, is inclined to find a constitutional violation here. And for the reasons we lay out on our brief. You want us to say it's not clearly established? That's correct, Your Honor. This court. Totally ignored the second circuit and the Supreme court. I mean, what? I mean, a lot of it's how you would frame that issue, I'm sure. But you don't think if there is a constitutional violation, which to get to that, we have to assume, assuming there's a constitutional violation, you violated this woman's constitutional right by searching her. It's not clearly established that a police officer cannot strip search someone whom they have some belief or whatever under these circumstances. So I think the second prong of the qualified immunity analysis, the constitutional right at issue has to be beyond debate. And this court has not even in a published case applied yet the reasonable suspicion. And it can be a consensus of other circuits and it can most importantly, and we yet the Supreme court hasn't clearly told us yet, it come from the United States Supreme court. And there seems to be a lot out there that says that could be the case. So I think on the totality of the circumstances test, Your Honor, it has to be a case that has facts analogous to the ones here. And the U S Supreme court was clear in the city of Escondido case, just this last term, it was a summary reversal of the ninth circuit defining the right at too high a generality. I think it's notable on this. The court in Escondido made it very clear. You didn't have to have something exactly on point. And there are tons of other cases that deal with not only don't you have to point if, if there's something that's obvious and fairly well established in that, that vein is true. And it can come from circuit cases. That's correct. But I think what's telling is looking at the cases that my friend on the other side cites. I mean the, the cases, for example, the doctorate case from the 1994 case from the sixth circuit that my friend on the other side says as an initial matter, he doesn't cite any published case law in the fourth circuit on point showing that this right is clearly established from our perspective of showing the right is clearly established, not is not clearly established who has that burden. So I think when, when the person opposing qualified immunity cannot point to any of to any cases whatsoever, that's when the second prong of the qualified immunity analysis kicks in in terms of establishing the applicability of qualified immunity that that would be on us, your honor. But I think the fact that he only cites case law from other jurisdictions and case law that's very distinguishable from other jurisdictions highlights precisely why this, the, the right at issue to the extent, there is any constitutional violation here. You're hit on an issue that is just making judges across the country pull their you, your own point in terms of this clearly established business circuits are different on it. U.S. Supreme court has given us absolutely nothing. They're skipping the constitutional violation, going to clearly establish that you're right in Escondido. They jumped on the ninth circuit and says, you know, think hard and all that kind of stuff before you do it. But nonetheless, these cases are all across the country. And I think this is one you can get pretty close to saying it's going to be hard to say this is not clearly established that the, and it depends on how you frame the issue. But I think when you have a person to come in, a woman to come in, she appears to be reputable in every sense of the word. She's just going to visit someone in prison. She's already been through a criminal screening test and you subject her to that type of intrusive search. The most, I think any, I'm not speaking on behalf of women, but I speak on behalf of a man. I know I would, you know, to make you take your clothes off, to make you take out in her instance, a tampon to examine your anal areas. And that what officer would not believe that that constitutional right to be free from that is not clearly established. I know what the case law is going, but common sense is going to come in this play one of these days. And I read these cases and I look at and stand back. So I know what the Supreme court said. I know what these other cases are saying, but the guy, everybody on planet earth is looking, says, what officer did not believe that was clearly established? You can't do that. I think I think part of it is a question of, you know, going back to the reasonable suspicion standard. Your honor, may I complete my response? These are extremely difficult cases, your honor. You're completely right that this is a difficult situation that all the parties at issue are in. And it's the notion of a search that involves removal of a tampon is extremely uncomfortable. I think it's important to, to take that in light of the challenge that officers have trying to regulate the difficult security concerns in prisons, the effort to smuggle these tiny little strips of drugs into prisons and the security concerns that arise from that. Offenders have been, have been known to immediately ingest those drugs upon upon transfer. And so that's why it's important to step in quickly to try to prevent these sorts of situations that has caused overdose and violence. And so it's a precarious situation, just the prison condition as a whole. And that's what the officers are trying to manage in this situation. We ask that this court affirm. Thank you. I want to say I am particularly impressed with your professionalism and the way that you answered my questions. And I thank you for your respectfulness and courtesies. Thank you, your honor. Mr. Okay. Just a few points. I think the defendants are kind of walking a tightrope here. They realized that the tip and none of the other information indicated particular, I suspicion that Ms. Calloway was engaged in some sort of criminal scheme with Talbert in response to, they'd given up anything on that. Well, I think that in their briefs, your honor, they indicated, well, you know, the court didn't rely entirely on the videotape because I went through a full exposition of the sites to the record on the videotape provided by Jeremy Nelson. These are the points that I thought were suspicious behavior by Ms. Calloway page 12 and 13 of 12 and 13 of my opening brief kind of broke down and deconstructed each of those showing that there's no suspicious behavior at the times indicated by Jeremy Nelson. So the Commonwealth, the defendant's answer to that was, well, the judge didn't really decide this solely on the basis of the videotape. They had these other five facts. Well, as we have discussed over the course of this morning, none of these five facts provided particularized suspicion as to Ms. Calloway Talbert's history of smuggling tobacco had nothing to do with her. The tip to low key. Didn't say even Talbert's last name, just Travis is moving. That doesn't even necessarily relate to Travis Talbert going in there to see him. She was just going in to visit him, just going in there to see him. She was the one going in there to see him. Yes, Your Honor. He's the one that the tip related to. Yes, Your Honor. He said the tip standing alone is not enough. You got to look at the rest of the circumstance. Yes. And the rest of the rest of the circumstances. So the rest of the circumstances, Your Honor, include the reason I think that low key gave a heads up to Nelson. Hey, if Talbert gets any visitors, keep an eye on them. Talbert had written some sloppy love letter by email to Calloway on Friday before the visit saying, oh, a romantic interest. There was no criminal. She was coming in there. That's correct, Your Honor. And he was transferred from Bland up there to Augusta County, where you're from, Stanton, to because he was suspected of smuggling things, contraband into the Virginia prison system. That's correct, Your Honor. He used a lot of things on the contraband list. He and another inmate. Lots and lots of things. That's true. It can be weapons. It can be tobacco. That's right. The drugs all be pens and paper contraband in the prison. That's correct, Your Honor. And the prior incident with Talbert involved his I guess his mother and another inmate and a friend. And it didn't involve anything to do with visitation. So there was no real tip, no real indication that Calloway was involved in anything. And honestly, Your Honor, I think the point that I made in my brief about the Scott versus Harris decision by the U.S. Supreme Court, that sometimes it's OK when someone's case is completely destroyed by the objective evidence of a videotape or a recording or something like that. You don't necessarily need to go through the whole analysis of looking at all the facts in the light most favorable to the non-moving party. But in this case, those factors were not. If anything, the videotape is a toss up. I think it's a fair question for the jury. Is what you see on these 87 minutes of videotape that was viewed by Nelson and reported to Loki, is that something that indicates reasonably suspicious conduct by Ms. Calloway, indicating she's bringing in contraband? Or is it innocuous conduct that she's adjusting her clothes and fiddling with her hair and, you know, doing that kind of stuff over the course of a 90 minute sit down with a prisoner where guards are circulating throughout the room constantly? There's two or three guards up at the dais in the front of the room watching for suspicious behavior. There's someone right behind Ms. Calloway in the video frame who has her hands hidden up in her shirt, down in her pants, jiggling her leg, looking all nervous the whole time for an hour while Calloway sat there talking with under the totality of the circumstances, it seems like Loki may have gotten played by the tipster who gave him the tip in the yard that, hey, Travis is moving. And Assistant Warden Miller indicated that oftentimes they get garbage tips where an inmate is trying to point the finger at somebody else to get the light off of them. I think that certainly could what could have happened here. It certainly makes sense. It's the most simple solution of what went on in this case is that perhaps Loki got played. He overreacted. He took it upon himself to go, you know what, any reason, just give me any reason at all, I'll pull her in. And what did he say was the reason that he pulled her out of visitation in the first place? Well, we just wanted to talk to her. Well, you know, they whisked her out of that room without a word. They take her across the door, pop a couple of secure doors and move her to a place within the prison complex where inmates are allowed to run free. They immediately accuse her. We've got you on camera. We saw you trying to unbutton your pants. We've got you red handed. What do you have to say about that? And she said, I don't know what you're talking about. I didn't do these things. I would never do these things. I have a sister who's a police officer. I would never be searched. And she signed a consent and they said, you can leave if you want to. You don't have to be searched. She contests that your honor. She disputes. She says she was never told she could leave. She had never told that she didn't have to answer their questions. She said that I was terrified. I did exactly what they told me when they told me to check these boxes and sign my name on this form. I did. And that's why the judge in the initial decision in this case left open the question of whether consent was voluntary or involuntary. I think it's a question for trial. I ask you a question. Questions anymore. The standard that everybody seems to be focusing on here, which I think is probably right, is reasonable suspicion. Yes, your honor. And the prison officials have a right to search if there's a reasonable suspicion. Is that standard the same as the Terry Stopp reasonable suspicion? I don't recall if Terry Stopp is reasonable suspicion or probable cause, but it's reason in the prison context, whether you're talking about a strip search of a prisoner, which there's been lots of decisions on that. I'm asking about a standard. And I think that the way the courts apply reasonable suspicion, in other words, the officers have to focus on articulable facts that give reasonable suspicion. Yes, your honor. And in this case, you have a conglomerate of information pulled together through Nelson, Loki and Brown about the end and the intake officers about circumstances that Loki says gave him reasonable suspicion. Yes, your honor. My question is, is that standard for determining whether that is reasonable suspicion the same we would apply in a stop made under Terry? I don't believe so, your honor. The reasonable suspicion standard articulated in Leverett took into account. I'm asking you a question about Terry. I'm asking you, is it the same constitutional standard reasonable suspicion that is applied in Terry? Is that the same as this reasonable suspicion? I can't say, your honor. I'm sorry. I hadn't seen Terry discussed in the context of these prison search cases. I think that the reasonable suspicion standard articulated in Leverett and Daugherty and some of the other ones that we both parties cited take into account the specific security concerns in a prison. And I think they determined that as to employees to get to the standard, in other words, you don't need probable cause like you have on a warrant. You need a reasonable suspicion. Yes, but also the circumstances I'm simply asking you, is there a distinction in the constitutional law as to a reasonable suspicion used in the prison context that level of evidence you have to get? Is that analogous to the reasonable suspicion that you have to make a Terry stop? I think it's certainly derived from what they're looking for in the prison circumstance. Is there a reasonable suspicion that the person that you're wanting to search is trying to bring in contraband to the prison? That's a specific. That does not address my question at all. My question is talking about a constitutional standard. Okay. And the question is reasonable suspicion, but I gather you don't know whether there's a distinction. I'm not sure, Your Honor. I can't say that it's reasonable suspicion plus in this situation, uh, as opposed to what reasonable suspicion means in the Terry situation. I would say what you can't, you can't say that you have any authority that it's different. Well, the authority, the authority that I've cited Bell versus Wolfish Hunter versus Auger Leverett versus Bell, Dougherty versus Campbell. They all apply the reasonable suspicion standard in the prison context. And so you have to have articulable particularized facts showing, indicating that someone is trying to bring in contraband before you search them in the prison context, because think about it in the prison context, everything is controlled by the COs. It from the parking lot to the entry building to what happens in visitation to who gets searched. The prisoners all get searched after contact visits. Thank you. Thank you, Mr. Thank you so much. We'll come down to Greek Council and take a short recess. This honorable court will take a brief recess.
judges: Paul V. Niemeyer, Robert B. King, James A. Wynn Jr.